# IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
## AT KNOXVILLE
### November 19, 2019 Session

## STATE OF TENNESSEE v. JEREMY REYNOLDS

### Appeal from the Criminal Court for Hamilton County
#### No. 290147    Barry A. Steelman, Judge

### No. E2018-01732-CCA-R3-CD

The Defendant, Jeremy Reynolds, appeals his Hamilton County Criminal Court jury conviction for first degree premeditated murder. See Tenn. Code Ann. § 39-13-202. On appeal, the Defendant argues that (1) the evidence was insufficient to support his conviction; (2) the trial court erred by admitting evidence that the Defendant and other individuals were gang members in violation of Tennessee Rules of Evidence 403 and 404(b); (3) exculpatory evidence, namely the victim's gunshot residue test and a photograph referenced by the gang report, were improperly withheld by the State; (4) the trial court erred by failing to compel the State to produce the above-referenced gunshot residue test and photograph; and (5) the cumulative effect of these errors deprived the Defendant of a fair trial. After a thorough review of the record and applicable law, we conclude that the evidence is insufficient relevant to premeditation and that some of the evidence relative to gangs was improperly admitted. We remand for a new trial on one count of second degree murder, in which some gang evidence shall be excluded.

### Tenn. R. App. P. 3; Judgment of the Criminal Court Reversed; Case Remanded

D. KELLY THOMAS, JR., J., delivered the opinion of the court, in which THOMAS T. WOODALL and JAMES CURWOOD WITT, JR., JJ., joined.

John G. McDougal (at trial and on appeal) and Chris Dixson (at trial), Chattanooga, Tennessee, for the appellant, Jeremy Reynolds.

Herbert H. Slatery III, Attorney General and Reporter; Katherine C. Redding, Assistant Attorney General; Neil Pinkston, District Attorney General; Lance W. Pope, Executive Assistant District Attorney General; and Kevin T. Brown, Assistant District Attorney General, for the appellee, State of Tennessee.

# OPINION

## FACTUAL BACKGROUND

This case arises from the May 5, 2013 shooting death of twenty-year-old Wendell Washington. The Hamilton County Grand Jury charged the Defendant with one count of first degree premeditated murder and one count of unlawful possession of a firearm by a convicted felon.[1]

1. <u>Motion in Limine</u>. Prior to trial, the Defendant filed a motion in limine to exclude evidence of the Defendant's gang affiliation or gang activity, arguing that the evidence served no purpose other than to inflame the jury. On the same day, the State filed a notice of intent to introduce evidence of the Defendant's gang membership and requesting a hearing pursuant to Tennessee Rule of Evidence 404(b). The State argued that the information would be introduced for the purposes of establishing the Defendant's identity and completing the story. The State noted that the Defendant's membership in the Gangster Disciples was the only link between him, Deaunte Duncan, and Gerald Jackson.

At a pretrial hearing, the prosecutor summarized the evidence he sought to introduce as follows:

> We're seeking to introduce evidence at trial through Officer Curtis Penney from the Chattanooga Police Department . . . that this defendant . . . is a member of the Gangster Disciples street gang. I am not seeking to introduce proof of a feud in the city between the Gangster Disciples and any other group[,] . . . of the way someone is promoted within the ranks of the Gangster Disciples gang[, or] proof of other violent acts of the [D]efendant or any other member of the Gangster Disciples gang.

> I am seeking solely to introduce the [D]efendant's affiliation with the Gangster Disciples, and this is the reason[:] The primary argument in this case will be identity of the person or persons [who] killed [the victim] on the evening of May the 5th of 2013.

> . . . .

> . . . [V]ery close in time to [the] homicide, [the Defendant] is dropped off at Erlanger [Hospital], and it's on video. He's dropped off by two other

---

[1] The firearm charge was bifurcated for trial and dismissed by the State after the jury returned a guilty verdict on the murder charge.

individuals. They show up in a light-colored SUV, carry [the Defendant] into the emergency room, literally drop him off on a gurney and leave.

> One of those people is [Mr.] Duncan, his co-defendant that's separately indicted for this homicide[.]

The third person that drops off [the Defendant] at the hospital is unidentified.

> . . . .

> The State seeks to introduce evidence pursuant to [Rule] 404(b) that [the Defendant] is a Gangster Disciple; pursuant to [Rules] 401 and 403, that [Mr.] Duncan . . . is also a Gangster Disciple.

> . . . .

> The additional piece of evidence that I want to introduce under 401 and 403 is that . . . Gerald Jackson is a member of the Gangster Disciple[s] gang, and the reason this is relevant [is that] . . . [the victim] on his front porch [was] killed with two different firearms. One is a .38-caliber revolver and one is a .45-caliber semi automatic.

> . . . .

> [In] July of 2013, Gerald Jackson, a fellow Gangster Disciple, is stopped in connection with another robbery. When he's stopped, in the vehicle . . . is a .45-caliber semi automatic weapon.

The State noted that testing by the Tennessee Bureau of Investigation (TBI) conclusively identified the .45-caliber pistol as the same one that fired bullets collected at the victim's house. The State argued that without common gang membership between the Defendant, Mr. Jackson, and Mr. Duncan, the jury would have "no contextual backdrop for these parties' affiliation or how they know each other, if they know each other, or if they're connected in any way."

Upon questioning by the trial court, defense counsel noted that Mr. Jackson was incarcerated at the time of the victim's death and could not have committed the crime. Defense counsel noted a recently publicized "crackdown" on gang activity and stated that in his experience, "any time . . . the jury hears 'gang,' it goes very badly after that, they figure the person is a member of a gang, even through the . . . Court of [Criminal] Appeals did recently come out and say . . . being a member of a gang is not a crime."

Counsel argued that the evidence was not relevant and that nothing indicated the homicide was a "gang crime."

The trial court found, "[W]hat [the prosecutor] is talking about is certainly relevant, the fact that these people have voluntarily . . . chosen to affiliate themselves and identify themselves with a gang[.] . . . That gang status may be relevant to something. [The State] say it's relevant to establishing somebody's identity." The trial court also agreed that evidence of gang membership "[could] be very prejudicial" and asked to hear the proposed evidence.

Chattanooga Police Department (CPD) Investigator Curtis Penney testified that between 2010 and 2015, he worked with the "special investigations division," which "was the gang unit for the city at that time." Investigator Penney's work made him most familiar with the Gangster Disciples and the "Rolling 60 Crips" in East Chattanooga. At the time of the hearing, Investigator Penney worked in the CPD criminal intelligence unit. As part of his job, Investigator Penney collected "gang validation forms," which was a standardized form from the National Gang Information Center. Investigator Penney explained that each individual was assigned a certain number of points on the form based upon a variety of factors; a "validated" gang member had ten or more points. Moreover, admitting to gang membership was not sufficient to garner ten points. Individuals with less than ten points were considered affiliates of a gang.

On May 10, 2013, the Defendant was validated as a gang member of the Gangster Disciples with fourteen points; his gang nickname was "Sleepy" or "Sleepy G." The Defendant's gang validation form reflected that he received eight points for "gang tattoos or brands" and three points for "use or possession of symbols, logos, colors, et cetera," which "could vary from anything from a bandana to throwing up gang signs." The Defendant received one additional point for known contact with confirmed gang members and two points "for participating in a photo with confirmed gang members." Investigator Penney stated that his information about the Defendant was compiled from informant interviews, "things that we've recovered from search warrants, documentation, [and] books that explain certain aspects of the gang."

Investigator Penney acknowledged that the Defendant's Tennessee Department of Correction (TDOC) record noted his status as an "enforcer with the Black Gangster Disciples." Investigator Penney stated that more recent documentation listed the Defendant as an "associate regent," meaning that the Defendant was "fairly high up" in the organization. Investigator Penney identified a photograph in which the Defendant wore a belt containing a gang symbol and appeared with Gangster Disciples members, some of whom were also highly ranked. The other people included Mr. Duncan, as well as Christian Woods. Investigator Penney noted that in 2005, the Defendant and Mr.

-4-

Woods were both suspects in a robbery-homicide. As a result of the 2005 incident, the Defendant served time in prison for faciliation of second degree murder.

On cross-examination, Investigator Penney acknowledged that he did not compose the Defendant's gang validation form. He agreed that the Defendant had not admitted to being a Gangster Disciple. Investigator Penney disagreed that it was easy to be validated as a gang member simply by "hanging around" other gang members, stating that many people had gang tattoos or other indicia of gang affiliation but that it was "sometimes extremely difficult to get someone to ten points." Investigator Penney denied that once a person had been validated as a gang member, "you're pretty much on there forever." He stated that if no new indicia of gang activity appeared for five years, the person would be removed from the list of validated gang members.

Investigator Penney testified that although some people in gangs were involved in a "criminal enterprise," not all gang members committed crimes. He described distinct branches of the Gangster Disciples, and stated that some Gangster Disciples members in the "7-20 movement" lived by tenants of "community betterment, to help the black community on political standing, et cetera." Investigator Penney stated that although conflict could occur between Gangster Disciples members, common gang membership meant that the members "[ran] together." He had never seen documented instances of members of the same gang trying to kill one another.

Investigator Penney testified that he had previously taken around twelve days of continuing education and training courses on basic investigation, organized crime, and advanced gang investigations. He also had five years' experience with "hands-on dealing with gangs on a daily basis." Investigator Penney acknowledged that "just being seen with somebody, like, on Facebook or anything else like that" would be sufficient to classify a person as a gang associate; however, "before [his department would] even attempt to do a form, . . . [they would] want more than that"; for example, he would research whether the person and the gang member had been stopped by police or committed a crime together.

Investigator Penney testified that in one of the photographs in which the Defendant appeared with other people, his assessment of which aspects of the photograph were gang symbols was based upon the "totality of all the circumstances." For example, the Defendant wore a belt buckle in the shape of the Star of David, which Investigator Penney identified as a gang symbol based upon the context of the photograph.

Relative to the determination that the Defendant was a gang member, defense counsel argued that if the trial court was "going by" the police's classification of the Defendant as a gang member, "there[ was] nothing more to argue." Counsel stated that the next issue to consider was whether to "bring in the acts of others." Counsel noted that

Mr. Duncan was alleged to be "an unindicted co-conspirator" and that the State "shouldn't be able to convict [the Defendant] based upon the acts of others unless they can show he controlled that[.]"

The trial court found that Investigator Penney was an unspecified expert, presumably on gang information in Chattanooga, and that the CPD's documentation established that the Defendant was "publicizing the fact that he [was] a member of the Gangster Disciples by that photograph . . . dated February 15, 2013." The court noted that the photograph, which was posted to Facebook in a profile entitled, "All eyes on Sleepy," focused on a "huge tattoo of the letters 'G' and 'D'" and included a five-point star.[2] The court further noted the group photograph in which the Defendant wore a "five-star" belt buckle.

The trial court further found that the Defendant was photographed with three other people who "affiliated themselves" with the Gangster Disciples and who were making gang hand signs. The court found that it was "influenced" by the fact that the Defendant and "his co-defendant" were "associates in crime" and that Mr. Duncan dropped the Defendant off at the hospital. The court found that Mr. Woods was involved in a prior violent act with the Defendant. Relative to a November 27, 2012 photograph of the same group of people, the court found that the Defendant's gang-related tattoo was visible on his right elbow and that other people in the photograph were making gang hand signs. The court also noted the TDOC's identification of the Defendant as a Gangster Disciples member.

The trial court found relative to the CPD's identification of the Defendant as a Gangster Disciples member that although there had not been a "self-admission" of gang membership, the Defendant's "publicizing" his clothing and tattoos was "intended to be self-admission and identification." The court noted that it would have assigned the Defendant additional points on the gang validation form based upon this constructive "self-admission." The court found that the State had established by clear and convincing evidence that the Defendant was a member of the Gangster Disciples at the time of the victim's murder.

Investigator Penney was recalled as a witness and identified gang validation forms for Mr. Duncan and Mr. Jackson. Investigator Penney noted that Mr. Duncan, whose gang nicknames were "Z-ro or Coke," had fifteen points as of April 13, 2013, and had admitted to Gangster Disciples membership. Investigator Penney identified photographs in which Mr. Duncan appeared to be making gang hand signs with Mr. Woods, the Defendant, and two other known Gangster Disciples.

---

[2] The court mistakenly referred to a five-point star in its findings; Investigator Penney's testimony reflected that a six-point star was a common Gangster Disciples symbol.

Investigator Penney testified that Mr. Jackson's gang nicknames were "Jack Boy," referring to a person who commits robberies, and "G-Man." He identified two copies of Mr. Jackson's gang validation form dated June 19, 2013, and June 26, 2013, respectively. Investigator Penney noted that the TDOC had also validated Mr. Jackson as a Gangster Disciples member. TDOC's gang assessment form was dated February 1, 2013, and CPD's gang validation form was updated upon TDOC's notifying CPD that Mr. Jackson had been released from prison. Investigator Penney noted that generally, an inmate "may have already been out of custody for . . . a couple months before" appearing on TDOC's list of released gang members. The June 19, 2013 gang validation form reflected that Mr. Jackson had twenty-seven points and that he had been a passenger in a vehicle driven by another validated Gangster Disciples member. The June 26, 2013 form reflected that Mr. Jackson had eighteen points and had admitted to membership in the Gangster Disciples.

Defense counsel argued that Mr. Jackson was not photographed with the Defendant and that other than their common gang membership, Mr. Jackson was "not relevant to" the Defendant. The trial court found that Mr. Duncan made gang signs in three exhibited photographs and that Mr. Duncan admitted to the police that he was a gang member. The court also found that Mr. Duncan was "established to be a Gangster Disciple" about one month before the victim's murder.

The trial court found relative to Mr. Jackson that he admitted to gang involvement, had gang-related tattoos, and was identified as a gang member by the TDOC as of February 1, 2013. The court found that "all three individuals at issue were Gangster Disciples at the time of the crime[.]"

Relative to the probative value of the evidence, the State argued that the Defendant's rank in the gang and the relationship between the victim and "these men" were not relevant. The prosecutor noted, "I'm only trying to associate these three men together as having knowledge of one another, and therefore, making it more likely that these men are associated with one another, and therefore, Mr. Jackson can end up with the firearm used in this crime because he gets it from one of his associates . . . [who were] seen moments after the homicide together[.]" The State averred that it was not seeking to establish that the victim's murder was a "gang-related crime." Defense counsel responded, "[i]n which case, why . . . bring up gangs in the first place? It's not relevant except . . . to sit there and say to the jury, 'Oh, it's a gang[.]'"

The trial court noted that if the Defendant, Mr. Duncan, and Mr. Jackson were members of a fraternity, a church, or a sports team, the information would be admissible to prove a common association. Defense counsel responded that a "taint" existed on gang membership and noted this court's decision concluding that the gang enhancement statute was unconstitutional. The court responded,

Yeah, but let me say this, [counsel]. They choose that. They flaunt that. They're on Facebook saying, "[L]ook at my tattoo," basically. I mean, they're not verbalizing that.

. . . .

But they're saying, "Look at my tattoo, look at this sign, look at how I'm dressed, look at my piece of clothing here." They're publicizing their status.

And so what you're saying is, "But, gosh, Judge, that's prejudicial." Maybe it is. I mean, I'm sure it is or the State wouldn't be trying to get it into evidence against them, and I know I've got to weigh that against probative value.

The probative value, though, here, that [the prosecutor] says that he's trying to establish is not that they're mean, bad people because they're in a gang, but that they're in a gang and, therefore, they have a connection to each other . . . and that's it. That's the connection.

The trial court found that "it's very relevant. It's very relevant because that gang connection connects them to each other." Defense counsel argued that the Gangster Disciples was "a nationwide organization" and that Mr. Jackson and the Defendant did not necessarily know one another simply by being members of the same gang. Counsel stated that "that's not what should be deciding this case" and that "the evidence," not gang affiliation, should establish whether the Defendant murdered the victim. Counsel argued that there was "no way to connect the pistol" Mr. Jackson possessed to the Defendant. Counsel acknowledged that the photograph of Mr. Duncan and the Defendant established that they knew each other, as did the hospital surveillance recording.

Upon questioning by the trial court regarding the relevance of Mr. Jackson's gang status, the State first addressed the topic of Mr. Duncan's gang membership and argued, "Establishing that Mr. Duncan and [the Defendant] are in the same gang show[ed] that they have a connection other than just at the hospital that particular night after the shooting." The State further argued that Mr. Duncan and the Defendant were "in the same gang as the man who [was] in possession of the weapon used to kill [the victim.] That ma[de] it more likely that one of his fellow gang members [gave] him the gun used to kill the victim in this case. It establishe[d] a connection between the man at the scene and the man [who] ha[d] the gun." The State noted that counsel's argument regarding the gang being a nationwide organization did not "lessen the relevance of the evidence or change the prejudicial effect. It's the same evidence. It's a good cross examination point

or closing point." The State further noted that Investigator Penney would concede that some Gangster Disciples did not commit crimes.

When asked by the trial court to clarify its argument, the State articulated that identity was "the key issue" in the victim's murder, that the evidence of the Defendant's gang membership would be introduced to prove identity and complete the story, and that the evidence was "highly probative" such that the prejudicial effect did not outweigh it, given "the key issue in the case of identity." The State noted that the Defendant's Gangster Disciples membership was "particularly relevant" due to the involvement of Mr. Duncan at the hospital and Mr. Jackson's possessing the murder weapons months later.

Defense counsel responded that the State "want[ed] to go ahead and state that [the Defendant] or [Mr. Duncan] passed the gun over to Mr. Jackson, so that right there, that's prejudicial[.]" Counsel argued that the connection to Mr. Jackson relied upon prejudicial "speculation" and "making assumptions" that "they're all criminals, they all pass guns back and forth." The State responded that the evidence was relevant because common gang membership made it "more likely that [Mr. Jackson's] associates committed the crime so that he could receive the gun through the gang." The State commented, "There's not any speculation about that. He does get the gun, they are all fellow gang members, and the jury can take that evidence for whatever it's worth, but it's definitely relevant." Counsel responded that there was publicity about "crimes that are specifically allocated to gangs" and that the jury would assume the Defendant was guilty if it were informed about the Defendant's gang membership. Counsel analogized to a previous prohibition against referencing a defendant's mafia association. Counsel argued that instead of having to prove how Mr. Jackson obtained the gun, the State was presenting evidence that "[w]ell, they're gang members, the gang gave it to him."

The trial court determined that a material issue existed other than propensity, reasoning as follows:

> [The non-propensity issue] is whether or not the [D]efendant can be identified as the person who shot the [victim] or was present at the scene and was at least criminally responsible for the homicide of the victim . . . and also completion of the story, because there is this incident where the actual murder weapon, according to the TBI, was recovered from an individual who is not the [D]efendant at a later time, . . . and so those are the two non-propensity material issues, and so the [c]ourt finds that certainly identity and completion of the story are relevant.

The trial court then weighed the probative value and the danger of unfair prejudice:

Certainly, the probative value there would be that this association between people would explain to the jury and help the jury to understand why a third person would be in possession of a murder weapon when that person was not the one who went to the hospital like [the Defendant] did with the bullet in him, and would assist the jury to consider the whole story where the jury might otherwise be confused about why a third person, who was in the prison at the time . . . might be in possession of the weapon, that being that [the Defendant] and Mr. Duncan and Mr. Jackson, the person in possession of the murder weapon in July of 2013, which is just within two months, that they're all members of the Gangster Disciples, which is a connection. It is an affiliation. They're not Masons, they're not Kappa Sigs, they're not in the boys choir and they're not on the football team together, but they are Gangster Disciples. That's the reason why the defense believes that it would be so prejudicial for the jury to hear that.

Now, these people believe that it's important — [the Defendant] has illustrated, Mr. Duncan has illustrated that it's important for other people who are significant to him and who are viewing him to know that he is a Gangster Disciple. That's evident from what the [c]ourt has seen in these photographs. But now that we're at trial, he doesn't want the jury to know he's a Gangster Disciple because of the violence reduction initiative and because the community assumes that people in gangs are shooting each other. You know, the evidence I've seen is that they are shooting each other. I really don't think I have to determine those things to decide this case.

But again, that does influence me from the standpoint of the probative value that this status as a gang member has. It is probative . . . . [T]his is more than wearing red. I mean, this is hand signs, this is prominent tattoos, this is association with each other in photographs. This is, this is meant to make a statement, all of these things that they do that I've seen.

That's why I find that there's clear and convincing evidence. So that has probative value when it comes to identity and completion of the story. Otherwise, there's a big — at the end of the story, the jury may be in a position to kind of say, "That doesn't really make sense, what's this Jackson guy doing with the gun? He was in prison but yet he's got the gun." It completes the story. It explains the story.

Now, it is subject to cross-examination and impeachment when the defense stands up and says . . . [t]he State has no pictures of [the

Defendant] with Mr. Jackson. They can't establish that [the Defendant] even knew Mr. Jackson. But the State can say, "But there is a connection and the connection is that they are members of the Gangster Disciples and that that gives them an affiliation and an association, and therefore, it's probative."

What's the danger of the unfair prejudice? The danger of the unfair prejudice is that lay people in particular have a propensity . . . to assume that people who are in gangs are dangerous and they do violent things. Actually, they do. We're all kidding ourselves if we say that they don't. So people in gangs do and the public knows that. That doesn't mean, though, that [the Defendant] did, and I think that's why . . . there is a limiting instruction that instructs the jury that they can't consider it for any other purpose against the defendant other than the stated purpose of identity and completion of the story.

So even if a juror thinks that gang members do bad things, they are specifically instructed by the [c]ourt that they aren't to consider those things against [the Defendant] without any proof of those things, that this proof is not being offered for that purpose, and the law assumes that the jury follows the instructions of the [c]ourt.

So it is prejudicial that [the Defendant] is a member of a gang because of what jurors assume about gangs, but when the jury is properly instructed, it should not be unfairly prejudicial, and that prejudice would not be outweighed by the probative value here, which has to do with identity via the affiliation that this person, [the Defendant], has with Mr. Duncan and with Mr. Jackson as a result of their status in the Gangster Disciples. So I will allow the evidence to come in with regard to [the Defendant's] being a Gangster Disciple.

The trial court also determined that the Gangster Disciples membership status of Mr. Duncan and Mr. Jackson was relevant to completing the story and probative of the reason Mr. Jackson had the murder weapon; the court further determined that the evidence was not unfairly prejudicial:

All right. And I find that for the same reason, that the completion of this whole story and the affiliation and identity and the issue with identity sets [the Defendant] — I think part of his defense appears to me to be "I wasn't there." The [c]ourt's heavily influenced by the fact that he was somewhere in close proximity at the time that . . . the victim was shot and killed, and that [the Defendant] suffered a gunshot wound. So I find that

-11-

the fact that Mr. Duncan, who dropped [the Defendant] off at the hospital, is – the fact that he is a gang member and a Gangster Disciple, not just a gang member but a member of the same gang as [the Defendant], and I say that with regard to Mr. Jackson, too, not just a gang member but the same gang as [the Defendant]. I find, too, that that is probative and that that probative value is not substantially outweighed by any danger of unfair prejudice.

The trial court found that three photographs the State intended to enter as exhibits at trial were relevant and that the probative value substantially outweighed the danger of unfair prejudice. The photographs depicted the Defendant's tattoo of a six-point star and the initials "G.D." and two instances when the Defendant and Mr. Duncan appeared in a group in which gang hand signs were being made. The court commented,

They're in a gang, that's their status, gangs do bad things, but they're not ashamed of it in the photographs. I don't know why all of a sudden they want to duck from it when they're in court, so – I do know, but I'm just not sure that's just, really, particularly with a limiting instruction, so – I will say this, I'll caution the defense that the door could be opened for additional photographs if the State asks for it, depending on the vigor of the cross.

2. Trial. Before the beginning of trial, defense counsel made an oral motion to reconsider regarding the evidence of the Defendant's gang membership. Counsel noted for the trial court:

In the news there ha[s] been a lot about gang violence. The police have basically . . . increased up security because of gang problems. I was listening to talk radio. Basically the talk, that "they're all animals, they need to be put down," and I just worry about the chilling effect that [the word] "gangs" could have . . . . [T]his really isn't a gang case. I know that they wish to go ahead and complete the story . . . but I worry that instead of focusing on the facts of the case, they're going to be focusing on gangs[.]

Counsel stated that the morning newspaper had featured a story about gangs and that counsel feared that the Defendant would be unfairly prejudiced such that "gangs com[ing] into it will overshadow what evidence we bring forward . . . to where even, they may not listen – I mean, hopefully they'll listen to the [c]ourt's admonitions[.]" Counsel requested a "special" jury instruction that the Defendant was not "on trial for" being in a gang. Counsel further requested that the court prohibit references to the Defendant's rank in the gang.

-12-

The State responded that it would redact the Defendant's rank listed on the gang validation form as well as a reference to the Defendant's previous incarceration. The State further requested that the trial court give a limiting instruction during evidence and jury instructions regarding the purposes for which it could consider Rule 404(b) evidence.

The trial court denied the Defendant's motion to reconsider, finding that publicity on the local violence reduction initiative had been discussed at the pretrial hearing and that the court's reasoning and basis for its decision had not changed.

After the State and the Defendant both discussed gang membership in opening arguments, the trial court issued a limiting instruction that the jury was to consider the Defendant's gang membership only "for the limited purpose of determining whether it provides the complete story of the crime" and "determining whether it provides the [D]efendant's identity[.]"

Kirsten Harley Stokes, the victim's girlfriend of three years, and Diana Washington, the victim's mother, both lived with the victim and testified regarding their observations on May 5, 2013. Ms. Washington had arrived home from work around 6:30 p.m. and was asleep when Ms. Stokes returned home from work at 10:30 p.m. Ms. Stokes stated that the victim worked as a roofer and also sold marijuana and "pills," although she noted that he did not conduct drug transactions from his house and did not bring non-family members to the house. She agreed that the victim had recently acquired "nice things" and a newer car after saving up for them. Ms. Stokes also stated that the victim had purchased four or five guns after having been robbed of a sum of money at the house months prior to his death. Ms. Washington was unaware of the victim's selling drugs or owning guns.

Ms. Stokes testified that ten or fifteen minutes after she returned home and showered, she heard the victim pull up in his car and park across the street, which was not unusual. Ms. Stokes went to the front door and saw the victim's face through a glass pane at the top of the door. She looked down briefly and did not see the victim when she looked up. Ms. Stokes heard an unfamiliar voice and attempted to open the door, but it "kind of got pulled shut." She stated that she heard the victim "holler[]" but did not understand what he was saying. Ms. Stokes woke Ms. Washington and told her "something was going on"; the two women went to the front door. Ms. Washington averred that the shooting started before Ms. Stokes woke her, but Ms. Stokes said that it began after she and Ms. Washington reached the front door. Both women heard multiple gunshots; Ms. Stokes attempted to go outside, but Ms. Washington prevented her from doing so.

-13-

Some moments after the shooting stopped, the women went onto the front porch and saw the victim, who had been shot in the chest, lying down. Neither woman saw any people or cars leaving the scene. A neighbor ran to the porch and began performing CPR; Ms. Stokes went inside, retrieved a pillow for the victim and her cell phone, called 9-1-1, and assisted with the CPR. The victim moved his head back and forth, tried to breathe, and had his eyes open, although he was unable to speak. Ms. Stokes and Ms. Washington took a gun, money, and pills from the victim,[3] and Ms. Stokes hid them under a mattress inside the house. Ms. Stokes recognized the gun, a black pistol, as one of the victim's guns. Ms. Washington, who was distraught and in shock, called her daughter and then 9-1-1 just before the paramedics arrived.

A recording of Ms. Stokes's 9-1-1 call was played for the jury. In the recording, a woman was heard crying in the background as Ms. Stokes, who was also audibly upset, asked the operator to send an ambulance. Ms. Stokes told the operator that the victim had been shot multiple times in the chest and that the victim was breathing but unconscious. Ms. Stokes addressed the victim and asked him to wake up.

A recording of Ms. Washington's 9-1-1 call was played for the jury. In the recording, Ms. Washington told the operator that her son had been shot. Ms. Washington, who was difficult to understand, exclaimed loudly and cried. She stated that her neighbor was performing CPR on the victim. Ms. Washington stated that her neighbor had seen a "white truck or something" but that Ms. Washington did not know where the shooter was located.

Brandon Collier testified that on May 5, 2013, he lived on a street in the same vicinity as the victim's house. Mr. Collier let the family dog outside between 9:30 and 11:00 p.m. and heard five or six gunshots nearby "in rapid succession." Mr. Collier had previously served in the United States Marines and was familiar with the sound of gunfire; he characterized the sound as "small arms fire." Mr. Collier woke his wife, told her what he heard, and stood near a side window "waiting on anything to happen." Mr. Collier noted that "up to" five minutes later, he saw a "white Mitsubishi SUV fly through the stop sign" at an intersection visible from the window. Mr. Collier stated that the driver "seemed to be going a little faster than even the people that drove fastest through there" and described the driving as "[e]rratic[.]" Mr. Collier called the non-emergency police number the following day to report what he had seen.

On cross-examination, Mr. Collier testified that no trees or shrubs obstructed his view of the stop sign, that the intersection was illuminated by a street light, and that he was wearing his prescription eyeglasses at the time. Mr. Collier saw the "triple triangle symbol" identifying a Mitsubishi brand car; he noted that he thought it was a Mitsubishi

---

[3] There was conflicting testimony regarding which woman picked up the respective items.

Endeavor because he had recognized that model of SUV "all over the road" since that night. Mr. Collier denied that the SUV had a bicycle rack "or anything like that" on the back, and he did not recall whether the SUV had a roof rack. He stated that the SUV turned left onto Fairfax Road. The SUV was either "white or light silver. It was a very light color." He affirmed that he did not see the person or people inside the SUV. When shown a map of the area and the location of the victim's house, Mr. Collier agreed that the house appeared to be "fairly close" to his house, but he did not know how far away it was.

On redirect examination, Mr. Collier was shown a surveillance recording from Erlanger Hospital's emergency room entry, which showed a vehicle driving in at about 11:03 p.m. Mr. Collier identified the vehicle in the recording as the same make and model as the SUV he had seen. When asked whether it was the same color, Mr. Collier stated, "Close, I suppose. Like I said, it was definitely a lighter color vehicle."

On recross-examination, Mr. Collier acknowledged that he was shown the emergency room recording previously and that he was told the SUV had dropped off the Defendant. Mr. Collier said that he was not familiar with the rear window shape of Mitsubishi vehicles, only that the Mitsubishi Endeavor had "exaggerated fenders." He acknowledged that he only saw the SUV for a "couple of seconds" and that he did not own a Mitsubishi Endeavor.

Three additional 9-1-1 call recordings were played for the jury. In the first recording, which was time-stamped 10:57 p.m., a woman reported a "drive-by" shooting at a house near hers on an adjacent street; she heard about eight shots, but did not observe the shooting. In the second recording, which was also time-stamped 10:57 p.m., a man named Marvin Thompson reported a shooting and a "person down." He noted that the shooting occurred at a house "above" his and that a man was lying on the front porch. Mr. Thompson stated that he heard shots and saw a white SUV driving away, although he did not know any other details about the SUV. In the third recording, which was time-stamped 11:03 p.m., a woman reported a drive-by shooting and asked whether an ambulance was en route.

CPD officers responded to the crime scene and photographed and collected physical evidence. CPD Crime Scene Investigator Jerry McElroy collected .45-caliber shell casings, .45-caliber bullets, a PMC-40 Smith & Wesson shell casing, unfired PMC-40 bullets, and blood swabs from the porch; additional firearms, including a loaded Glock 23 .40-caliber pistol, a blood swab from that pistol, $590 cash, pills, and a bag of mixed ammunition from the victim's bedroom; and a blood swab, clothing items, two pistols, a spent shell casing, and an unfired PMC-40 bullet from the living room. A sedan parked in the house's carport had bullet holes in the passenger-side and driver-side rear fenders, but a bullet was not recovered at that location. Baggies of marijuana, scales, pills, and a

receipt for 9mm and .40-caliber ammunition were found in the victim's car. No blood was present on the grass or sidewalk, but it was noted that the ground was wet and muddy due to recent rain. Investigator McElroy noted that if a person wore layers during a shooting, it was common not to encounter blood at the scene.

Investigator McElroy testified that one box of PMC .45-caliber ammunition was found in the victim's house, although no .45-caliber firearm was located there. The box was missing twelve or thirteen bullets. Some of the ammunition in the mixed bag did not correspond to any of the firearms found at the victim's house. Investigator McElroy agreed at least some of the five spent shell casings on the porch were ".45 Blazer autos" and that some of the casings were "R&P" brand. Investigator McElroy did not collect any fingerprints at the scene.

Officers later obtained an unfired .45-caliber bullet that was packaged in a plastic jar and placed on a table next to the Defendant's hospital bed; the jar was sitting beside a bag, which contained the Defendant's clothing and other belongings.[4] The Defendant was the only person being treated in the hospital room. The hospital also provided the victim's personal effects, which included an unpackaged, unfired bullet that was found in his clothing. Officers were provided one bullet recovered from the victim's body at autopsy and one bullet removed from the Defendant in surgery.

CPD Sergeant Heather Williams took gunshot residue samples from the victim's hands. Because the Defendant was in surgery by the time Sergeant Williams arrived, she was unable to perform a gunshot residue test on him.

An Erlanger Hospital surveillance recording from the night of the vicitm's murder was played for the jury, and CPD Sergeant Daniel Francis, who collected the recording, stated that the footage showed three angles of the emergency room. The recordings depicted the emergency room lobby facing the front windows and entryway, a second angle of the lobby facing the check-in window, and a third angle showing the check-in office facing the lobby. In two of the recordings, a light-colored SUV of indeterminate color was visible driving past the windows. After parking near the door, two African-American men carried a third man toward the check-in office. Nurses rolled a gurney out to the lobby, and the two men deposited the third man onto it before walking out of the lobby. A nurse ran to the door as the SUV drove away. No brand markings were visible on the SUV.

---

[4] The hospital staff member who removed the unfired bullet from the Defendant's person was unable to be located; this gap in the chain of custody was the subject of some argument at trial. Ultimately, the trial court allowed testimony regarding the location of the bullet upon officers' arrival but did not permit the officer to state that the bullet came from the Defendant.

Sergeant Francis identified a stock photograph of a Mitsubishi Endeavor and described the triangular "diamond" Mitsubishi emblem. Defense counsel showed Sergeant Francis several stock photographs of white SUVs of various makes and models; all had similar characteristics in build to the Mitsubishi Endeavor. He maintained, however, that by examining the body characteristics of the SUV in the hospital surveillance recording, he believed the SUV was a Mitsubishi. He acknowledged that he was not "a hundred percent" certain.

Sergeant Francis testified that he did not send the victim's GSR test to the TBI for testing because TBI policy was not to perform testing on victim GSR swabs. He noted that it was clear from the crime scene and Ms. Washington's admitting to moving the victim's gun that the victim "was associated with a firearm."

Sergeant Francis testified that one of the routes from the victim's house to Erlanger Hospital involved driving up Fairfax Road, which was consistent with Mr. Collier's observations. Traffic cameras from the other primary route did not show a white SUV's traveling through the area in the relevant timeframe. Sergeant Francis drove from the victim's house to Erlanger Hospital at the same time of night as the shooting and using the Fairfax Road route; while obeying all traffic laws, it took him ten minutes, thirty-seven seconds to arrive at the hospital.

Sergeant Francis testified that no eyewitnesses placed the Defendant at the victim's house on the night of his murder. Further, no physical evidence at the crime scene was identified as belonging to the Defendant, and the Defendant was not carrying a gun at the hospital. Sergeant Francis did not know whether the Defendant fired a gun that night. Sergeant Francis agreed that the Defendant was shot with a .40-caliber bullet and that the victim had a .40-caliber gun.

Sergeant Francis visited the Defendant in the hospital, and the Defendant declined to waive his right to an attorney; as a result, the interview did not proceed. Sergeant Francis stated that using Ms. Stokes's 9-1-1 call as an estimate for the time of the shooting, the SUV carrying the Defendant arrived at the hospital about seven minutes, forty-nine seconds later. He noted that Ms. Stokes's 9-1-1 call was made some indeterminate number of minutes after the SUV left and that she did not see a car. Sergeant Francis acknowledged that the road would have been wet from the rain and that he did not know with certainty which route the Defendant took to the hospital. He further acknowledged that the route the Defendant was alleged to have taken would have passed a police station.

TBI Agent Derek Proctor, an expert in forensic science, testified that he performed DNA testing on the swabs collected at the crime scene and compared the samples to buccal swabs from the Defendant and the victim. The blood swabs all matched the

victim's DNA and did not match the Defendant's DNA. A swab taken from blood on the victim's gun matched the victim's DNA. Although an additional, distinct allele was present, Agent Proctor was unable to test it due to the limited amount of material available.

Agent Proctor also tested two hats and a pair of sunglasses from the victim's house. All three items contained female DNA, and the hats contained some male DNA; the male DNA profile was limited such that "interpretation of the minor contributor [was] deemed to be inconclusive." He did not DNA test the unfired bullet from the victim's living room because the smooth surface of a bullet was unlikely to contain DNA.

CPD Detective Michael Early testified that on July 29, 2013, he investigated a robbery in which .45-caliber shell casings were recovered. On August 6, 2013, Detective Early conducted a traffic stop in connection with a second robbery in which a jewelry store was "shot up." One of the passengers was Gerald Jackson, and a .45-caliber pistol was found in the car; the pistol was sent to the TBI for ballistics testing.[5]

TBI Special Agent Teri Arney, an expert in firearms examination, testified that she compared the shell casings and bullets recovered in the Defendant's case with both .40-caliber pistols found in the victim's house. The test-fired Glock 23 .40-caliber rounds matched class and individual characteristics of two PMC Smith & Wesson .40-caliber shell casings from the crime scene. She noted that three unfired PMC Smith & Wesson .40-caliber jacketed hollow point rounds were also included in the evidence delivered to her. The Glock's magazine contained eight unfired PMC Smith & Wesson .40-caliber jacketed hollow point rounds; the gun would have held fourteen bullets at maximum.

Special Agent Arney testified that the bullet recovered from the Defendant's body was .40-caliber. When asked how the bullet compared with the other bullets fired from the victim's Glock pistol, Special Agent Arney stated,

> Glock has what we call polygonal rifling, and basically this is a process where the interior of the barrel is hammer-forged into the shape of a polygon . . . . [T]he bullets are typically very very smooth and they have very few individual characteristics for comparison. So as is typical with most Glock bullets, the best that I can say is, it's a .40-caliber bullet, it has polygonal rifling characteristics, and it is the same any other Glock that has polygonal rifling.

---

[5] An evidence collection form reflected that the car that was stopped was owned by Mr. Jackson, and the gun's owner was listed as "Jeremy Clark."

Special Agent Arney further stated that although she could determine the bullet was "most likely" fired by a Glock firearm, she could not "link" the bullet to a specific Glock.

Special Agent Arney testified that the .45-caliber shell casings recovered at the crime scene all had "the same mechanical fingerprint, the individual characteristics from the same firearm" and that the class characteristics were consistent with having been fired by a Hi-Point brand firearm. She further determined that the .45-caliber bullets from the victim's porch and his clothing at the hospital were fired by the same Hi-Point brand firearm. A second .45-caliber bullet from the victim's porch had the same class characteristics as the other bullets, but it was so damaged that Special Agent Arney could not make a conclusive identification.

Special Agent Arney testified that at a later date, she examined the .45-caliber Hi-Point pistol recovered during Mr. Jackson's arrest. After test-firing the gun, Special Agent Arney determined that all five cartridge casings and the two bullets collected at the victim's house were conclusively fired by the Hi-Point pistol. Special Agent Arney also examined the unfired .45-caliber bullet that was with the Defendant's belongings at the hospital. Although she was unable to link the bullet to a particular firearm, she noted that the bullet had "mechanism marks" indicating that it had previously been loaded into a gun. Relative to the .38-caliber bullet recovered during the victim's autopsy, Special Agent Arney determined that it was fired by a revolver.

Special Agent Arney also conducted the muzzle-to-garment testing in this case. The Defendant's shirt reflected one hole that was consistent with a "contact firearm discharge" where the muzzle of the gun touched the shirt. A second hole was compared with the victim's Glock pistol; the Glock would have had to be fired from between three and twenty-four inches away to create the hole.

The victim's jacket reflected a contact firearm discharge in the left upper chest area; other holes in the left sleeve did not reflect gunpowder residue. A tear in the jacket hood contained lead residue and was consistent with "the passage of a projectile." A hole in the right chest area of the jacket was consistent with a bullet hole. Two holes in the jacket pocket were "consistent with the firearm being inside the jacket pocket when it was fired." An area of the jacket's lining was also melted consistently with a firearm's being discharged while adjacent to the fabric, but the bullet did not penetrate the jacket.

On cross-examination, Special Agent Arney testified that Glock .40-caliber guns were common; she acknowledged that other brands of firearms used polygonal rifling, but she maintained that the test-fired bullets were "very close" to the ones she examined. She stated that she only used the Glock test patterns when examining the Defendant's shirt because she was informed that a .40-caliber weapon was involved in his wound. Special Agent Arney matched the .45-caliber Hi Point pistol from Mr. Jackson to the

cartridge casings in the Defendant's case using a database of ballistics images. She stated that it was possible for the shot fired through the victim's jacket pocket to have caused the muzzle contact burns on the Defendant's shirt, although Special Agent Arney would need to test the respective fabrics to confirm that possibility. She agreed that her assessment of the Defendant's shirt did not assume an "intervening" object between the shirt and the gun's muzzle. She also agreed that she did not know how many bullets were originally loaded into the Glock or who possessed the gun.

After the Defendant again renewed his objection to the gang-related testimony and was overruled, Investigator Penney testified as an expert in gang intelligence regarding the CPD's method of gathering and recording information about gangs and gang members. Investigator Penney confirmed that the Defendant was a validated gang member. The trial court instructed the jury that if it found that the Defendant was a gang member at the time of the victim's murder, it was only to be considered to complete the story of the crime and to prove identity.

Investigator Penney continued to testify that the Defendant, Mr. Duncan, and Mr. Jackson were all members of the Gangster Disciples. Investigator Penney identified a photograph of the Defendant's gang tattoo; a photograph of the Defendant, Mr. Duncan, Mr. Woods, Ladarius Crowder, and an unidentified woman, in which the men made gang hand signs; and a second photograph of the same group in which the Defendant wore a six-point star belt buckle. The gang validation forms for the Defendant, Mr. Duncan, and Mr. Jackson were received as exhibits. Investigator Penney detailed the reasons for which Mr. Jackson and Mr. Duncan garnered enough points to be validated, including self-admission of gang membership, tattoos, and association with known gang members. Investigator Penney stated that Mr. Duncan appeared in a photograph with Mr. Woods, a known Gangster Disciple, and Roland Reynolds, who was "also previously associated with a traffic stop."

While explaining the significance of the hand signs the men in the group photographs made, Investigator Penney stated that holding up seven and four fingers, respectively, symbolized the seventh and fourth letters of the alphabet, or "G.D." He further explained that holding up three fingers symbolized a "pitchfork," and he elaborated as follows:

> Pitchforks is a — when you're talking about gang stuff, a lot of this comes from the prison system and a lot of it comes from areas in Chicago or California. In regards to Gangster Disciples, . . . there are gangs that are rivals to them. You have two nations. You have what's called Folk Nation, which Gangster Disciples fall under, and you have what's called the People Nation, which a lot of their rivals are in . . . . The pitchforks is basically a symbolism for Folk Nation. It's the uprising of nations. A lot

-20-

of times Gangster Disciples will talk about the oppression that they're under since it's the oppressing [sic] that they're uprising through, their struggles, so to speak.

Relative to Mr. Duncan, Investigator Penney noted that he was stopped by police in a car with "Roland Reynolds, who [was] known to be RoRo, who [was] a Gangster Disciple; Walter Maples; Terrance Palmer; Terrell Townsend. These [were] all well known, validated Gangster Disciples in Chattanooga." Investigator Penney stated that Mr. Duncan also appeared in a photograph with Mr. Woods and Mr. Reynolds.

Relative to the Defendant's gang validation form, Investigator Penney stated,

> [The Defendant] received eight points for gang-related tattoos, one of which is a 720 on his arm, and a six-point star on his chest. The 720, this refers to types of ideology. Gangster Disciples have two different types of ideology. One is called the 360, 360 or 360 degrees of knowledge or 360 degrees of pure knowledge of Gangster Disciple[s]. This is Larry Hoover, who was one of the originators of Gangster Disciples. This was part of their, for lack of better terms, during this time period, this was their idea of "shoot and ask questions later."

Defense counsel objected to the Investigator Penney's describing the "history of the gangs" and the use of the phrase "shoot and ask questions later"; counsel noted that "we're going way afar of just identifying [the Defendant] as a member of a gang." The trial court responded that Investigator Penney was "testifying about the significance of what '720' mean[t]" and said, " I don't know what it means, I've been in the criminal justice system for [twenty-one] years now, so I'm going to allow him to explain." Questioning resumed, but Investigator Penney was not asked to further define "720." Relative to the Defendant's tattoo, Investigator Penney stated that the tattoo depicted "a six-point star that has incorporated the letters G and D. The six-point star . . . is a sign of reverence for . . . one of the founding fathers of Gangster Disciples in Chicago." Counsel made an objection on the basis of relevance and was overruled. Investigator Penney continued,

> His name . . . [was] David Barksdale, who was one of the founding fathers, and the Star of David. After he passed away, this was their nod to him, a show of reverence, so the six-point star is used prolifically with the Gangster Disciples. As a matter of fact, each point of the star has a specific meaning. You'll see it in various different ways in this, in this, for example, being able to put a G and a D in there to kind of incorporate to show this is what he is.

On cross-examination, Investigator Penney acknowledged that "GD" could also stand for "growth and development." He stated that he knew of Mr. Crowder through "contacts with him, observations from Facebook, confidential informants, [and] reports." To the best of his knowledge, Mr. Crowder was one of the people in the photographs. Investigator Penney acknowledged that many young men in the African-American community were in gangs. When asked to estimate how many Gangster Disciples members were in Chattanooga, Investigator Penney was uncertain but agreed it was more than one hundred, not including the "associates" who were not validated as full members.

Investigator Penney agreed that the Gangster Disciples began in Chicago and stated that there was "no way of knowing" from where the Chattanooga branch originated. He affirmed that many Gangster Disciples members traveled through town and that there was no way to ascertain "who all c[ame] through town." Investigator Penney stated that not all gang members were violent and agreed that some gang members were active in community service.

TDOC probation and parole officer Christina Barnes testifed that on the date of the victim's murder, Mr. Jackson was incarcerated at West Tennessee State Penitentiary.

Hamilton County Chief Medical Examiner Dr. James Kenneth Metcalf, an expert in forensic pathology, testified that he performed the victim's autopsy. The cause of death was "multiple gunshot wounds to [the] trunk and left arm," and the manner of death was homicide. The victim was shot seven times; one bullet was recovered near the victim's collarbone, and some bullets had fragmented and reflected multiple exit points. The shots appeared to have been fired from the victim's left and at an upward angle.

Dr. Metcalf testified that the victim was shot twice in the back and several times in the left arm. The wounds stemming from the gunshots to the back were fatal, with the bullets hitting the victim's ribs, both lungs, and heart. Dr. Metcalf noted that the damage to the heart was extensive and that the victim would not have survived under any conditions.

On cross-examination, Dr. Metcalf testified that it was possible from the angle of the shots that the shooter stood in the grass and fired upward at the victim; however, given that shell casings were recovered on the front porch, Dr. Metcalf believed that the shooter was on the porch but "bent forward or . . . turned sideways more." He believed the victim was facing the front door when he was shot. Dr. Metcalf could not determine the order in which the shots were fired or the distance from which the victim was shot. The victim's body did not reflect gunpowder stippling. Dr. Metcalf stated that some of the entry wounds were toward the front of the victim's torso. On redirect examination, Dr. Metcalf agreed that it was possible that the victim was shot in the front of the chest,

turned and sustained gunshot wounds to his left arm, and was finally shot twice in the back.

At the close of the State's proof, the Defendant made a motion for a judgment of acquittal, arguing that the State had not proven premediation. The Defendant argued that his presence at the crime scene had not been established by witness or physical evidence; that a silver car brought the Defendant to the emergency room, not a white one; that the motive for the victim's murder and the perpetrator had not been established; that the manner in which the victim was shot made it unlikely the victim also shot the Defendant through the vicitim's pocket at point-blank range; that the Defendant sustained a close-range wound, whereas the victim's body did not contain stippling; that Mr. Collier did not observe the occupants of the white Mitsubishi SUV; that the Defendant did not have a gun when he arrived at the hospital; that the murder weapon was found three months later and did not contain the Defendant's fingerprints; and that only conjecture established that Mr. Duncan obtained the murder weapon from the Defendant. The Defendant noted that ballistics testing of the victim's gun was inconclusive when compared to the bullet taken from the Defendant.

The Defendant cited Sullivan v. State, 513 S.W.2d 152, 154 (Tenn. Crim. App. 1974), for the proposition that a jury may not base its verdict on "conjecture, guess, speculation, or mere possibility." He argued that the State had not shown "any direct or circumstantial evidence" that the Defendant shot the victim. The Defendant noted that although Mr. Jackson was in prison on the date of the victim's murder, the State had not eliminated as possible perpetrators the other people in the car in which the murder weapon was recovered. The Defendant argued that no evidence of a plan or intent to shoot the victim had been presented. The trial court made the following findings:

> Certainly, there is evidence that whoever shot [the victim] intended to kill [the victim] because he was shot seven times. The [c]ourt believes that the fact that [the victim] was shot seven times is indicative, circumstantially, of reflection and judgment and premeditation actually. It's been said that there is no proof of any premeditation, but the [c]ourt finds that that's ample proof when considered in the light most favorable to the nonmoving party.
>
> It's also been stated that there's no proof that . . . [the Defendant] shot [the victim]. Actually, there is proof that [the victim] was shot with a .45-caliber firearm, . . . there was evidence that a .45-caliber firearm was used located on the porch, and that when [the Defendant] was at the hospital and the police officer responded to the room where [the Defendant] was being treated, that he was handed a bag of clothing which has been

-23-

attributed to [the Defendant], and along with that bag of clothing was a .45-caliber bullet that was unspent.

Furthermore, [the Defendant] has, within his body, removed by Erlanger Hospital, a projectile from a .40-caliber, and I do understand that the defense established that the markings on the projectile would be consistent not only with a Glock, but with an H&K, with a Kahr, with rifles, but it is a .40-caliber and it is a JHP, and that is consistent with what was located at the crime scene, and it is also consistent with the victim's firearm which was fired at the crime scene, a Glock .40-caliber.

And according to Teri Arney, who is a ballistics expert with the TBI, that bullet that was within [the Defendant's] body was not only a .40-caliber, but it also . . . had consistent class characteristics to be linked to a Glock firearm. And again, that is another piece of circumstantial evidence.

. . . .

Also, there is evidence that the gunshot residue test from [the Defendant's] clothes puts him close in proximity to whatever firearm made that gunshot stippling residue on the clothes, which would be consistent with him being on the porch. Although the bullet located at Erlanger by the police officer does not establish that [the Defendant] had a gun in his hand, and [defense counsel] is correct that there are no prints, that there is no blood at the scene of [the Defendant's], nor any prints on the scene of [the Defendant's]. It is significant to note that the law says in Tennessee that, "A defendant is criminally responsible as a party to an offense if the offense was committed by the defendant's own conduct or by the conduct of another for which the defendant is criminally responsible, or by both, and each party to the offense may be charged with the commission of the offense."

So[,] "A defendant can be criminally responsible for an offense committed by the conduct of another if, acting with the intent to promote or assist the commission of the offense, the defendant aids or attempts to aid another person to commit the offense."

So really, all [the Defendant] has to do is be present and assisting, and I think the State has shown at least circumstantial evidence of that. Whether they've established that beyond a reasonable doubt is not the question. The question is whether or not a jury should be able to consider it . . . . [T]here is circumstantial evidence of two eyewitnesses in the form of

-24-

what was reported in the 911 calls about a light-colored/white SUV, and one witness even said that it was a Mitsubishi, and the State has presented proof that the vehicle that arrived at the hospital looked to be like a Mitsubishi, a 2013.

. . . .

[The Defendant] was dropped off by two other individuals, one of whom was Deaunte Duncan, a man also charged in this offense. The State has established that Mr. Duncan and [the Defendant] had a social association in a group from which also the individual who had the firearm two months later used to actually kill [the victim], according to Ms. Arney, that the individual who possessed the firearm two months later also had the same social affiliation with this gang.

There was actually circumstantial evidence, and there is, to show that this was a robbery: the fact that [the victim] apparently was [an] individual who made some income from the sale of pills, the fact that there was marijuana present and cash present, the fact that his car was such that most roofers . . . would [not] be able to afford[.]

So it's indicative that [the victim] had some illegal activity going on and that would have made him a target, perhaps, for a robbery, although the State doesn't have to prove motive.

. . . .

. . . [T]here is sufficient circumstantial evidence, in the [c]ourt's opinion, to allow this case to go to the jury and for the jury to determine [the Defendant's] culpability, if any.

Thereafter, an issue arose when a juror, who had been crying and visibly upset, was questioned by the trial court outside of the presence of the other jurors. The court noted that the juror reported to "Debbie" that she had not slept in two days. The juror stated that she had "really bad anxiety about all this" and that she "really, like, fear[ed] for [her] children in the future." The juror stated, "I don't feel safe at all." When asked whether she had discussed her feelings with the other jurors, she said, "Well, they obviously can see that." She stated, though, that she had told one other juror that she was "having real bad anxiety" and was "scared." The court did not inquire as to the source of her fear.

-25-

After the juror was excused, defense counsel noted his concern that the juror was afraid of potential gang retaliation and that her fear could "contaminate" the rest of the jury. The court excused the juror and polled the jury individually and out of one another's presence regarding each person's general ability to be impartial. The remaining jurors all affirmed that they had not discussed the evidence amongst themselves and that they could impartially decide the case based upon the evidence presented.

The Defendant presented no proof. The jury was instructed on criminal responsibility and facilitation, as well as several lesser-included offenses. Relative to the evidence of the Defendant's gang membership, the jury was instructed as follows:

> Evidence of membership in a gang: If from the proof you find that the [D]efendant was a member of a gang when the crime alleged in the indictment occurred, you may not consider such evidence to prove his disposition to commit such a crime as that for which he is on trial. This evidence may be considered by you for the limited purposes of determining whether it provides: A, the complete story of the crime; that is, such evidence may be considered by you where the [D]efendant's membership in a gang and the present alleged crime are logically related or connected, or are part of the same transaction, so that proof of the other tends or is necessary to prove the one charged, or is necessary for a complete account thereof; And B, the [D]efendant's identity; that is, such evidence may be considered by you if it tends to establish the [D]efendant's identity in the case on trial. Such evidence of gang membership, if considered by you for any purpose, must not be considered for any purpose other than those specifically stated.

The State's closing argument was as follows:

> [The Defendant] was prepared. He was prepared to confront [the victim], and he did. And as a result of that confrontation, [the victim] lay dead on his own front porch, shot seven times.

> On May the 5th, 2013, [the Defendant] got in that white Mitsubishi Endeavor, had a gun, a .45-caliber Hi-Point; got a fellow gang member, Deaunte Duncan, and another man, and they drove to [the victim's] house . . . and they confronted him.

> . . . .

> Judge told you that premeditation is the exercise of reflection and judgment. It happened in an instant.

-26-

[The victim] was shot seven times with two different bullets, a .45-caliber Hi-Point and a .38-caliber revolver. Shot with those weapons that [The Defendant] and the other men loaded, that they had with them when they got to [the victim's house], and they pulled those triggers. Trigger was pulled seven times . . . . That's the exercise of reflection and judgment.

Judge also told you that we have to prove identity, that it was [the Defendant] on that front porch, [the Defendant] that killed [the victim]. What puts [the Defendant] there? The Mitsubishi SUV. You heard Brandon Collier say that . . . he [saw] a white Mitsubishi SUV fly up Fairfax. You heard that 911 call tell you that it was a white Mitsubishi leaving the scene, and then approximately seven minutes later you see that white SUV on the Erlanger security video. You see it pull up to Erlanger, you see those two men carrying [the Defendant] into the emergency room, and then you see that SUV leave.

. . . .

You remember . . . it rained that night. The grass was wet in the front of the porch.

. . . .

What's that on [the Defendant's] jeans? It's mud. What's on his shoes? It's mud, from the front of [the victim's] house before he went on that porch and killed him.

The prosecutor stated that the Defendant had a .45-caliber bullet among his possessions at the hospital, that .45-caliber bullets and shell casings were present at the crime scene, and that the .45-caliber Hi-Point pistol was "taken off Gerald Jackson three months later." The prosecutor continued, "Those shell casings on that front porch . . . were fired out of that gun. Gerald Jackson was . . . in prison in West Tennessee but he had that gun because of [the Defendant], a fellow gang member." The prosecutor noted Investigator Penney's testimony that the Defendant, Mr. Duncan, and Mr. Jackson were "all Gangster Disciples, all Gangster Disciples in Chattanooga." The prosecutor further argued that the bullet taken out of the Defendant in surgery was the same caliber as the victim's Glock 23 and that the bullet shared the same class characteristics and some individual characteristics as the test-fired bullets from the gun.

The prosecutor argued that the victim's wounds were consistent with his trying to get away from "the man that was shooting him seven times" but "eventually died at the hands of Sleepy." The prosecutor concluded that the Defendant should be convicted of first degree premeditated murder "because he confronted [the victim]. He was prepared for that confrontation, because he killed [the victim]."

-27-

The Defendant discussed the gang evidence in his closing argument as follows:

They want to go ahead and bring up "gang." Remember, they . . . didn't say, "Oh, it's Jeremy Reynolds." He started out with Jeremy Reynolds, then he went "Sleepy." Why? Because he wants to use gangs to scare you, basically scare you into going ahead and convicting him, because they don't have any evidence that [the Defendant] did this.

The judge already instructed you as to the law on gangs, I'll go ahead and remind you of that a little bit, that the evidence may only be considered by you for the limited purposes of determining whether it provides a complete story of the crime.

So basically, it's just to go ahead and state that, well, the gangs are some part of the story. Their . . . story is that because he's a member of the Gangster Disciples, that obviously, that's how the gun got to Gerald Jackson. Now, do they have any proof of this? No. Ladies and gentlemen, they have no proof of anything.

. . . .

And the State says that, to complete the story, they want you to bring in the gangs. Sleepy, remember, he pointed at him and said, "Sleepy," to scare you, to basically say, "Oh, it's gangs." But they also want to say, "Well, there are other people involved in this." Where are they? Where is [Mr.] Duncan? . . . . Shoot, where are all the Gangster Disciples since they all seem to be involved with it? Just fill up that back row with all the Gangster Disciples, let's put them all on trial for this if they're involved. Why? Because they have no proof of it.

During the State's rebuttal, the prosecutor stated the following:

[The Defendant] and his buddies don't get to decide who lives and who dies. [Defense counsel] and the defense has [sic] made a lot of representations about what the proof is. They have been wrong about a lot of it. [The Defendant] was right about one thing through the course of this trial. I'm showing you Exhibit 146.[6] He was exactly right that all eyes have been on Sleepy this trial. This trial, you guys have had an opportunity to see exactly who [the Defendant] is, exactly how he behaves, and exactly what he does, and now you all have an awesome opportunity.

---

[6] Exhibit 146 referred to the photograph of the Defendant's gang tattoo.

-28-

You get to go back in that jury room, look at the law, look at the evidence, think about the actual testimony, and hold him responsible for his actions on the night of May the 5th of 2013.

You get to go back in that jury room, look at the evidence, and decide that you won't stand for it. You won't stand for his guns, you won't stand for his violence, for his shootings, for his gangs. You won't stand for it, and you'll hold him responsible for it.

. . . .

You all have the opportunity to do it. And how is it [you] do that? You don't have to confront [the Defendant] with a .45-caliber weapon. You don't need a .40 or a .38. You don't have to sneak up on his porch late in the evening with one of your partners with you. You get to go back in that jury room, and all it takes to show him that you won't stand for it and to hold him responsible for his actions is one check, one check at the top box of the verdict form[.]

It doesn't happen if you find him guilty of some lesser included offense, if you let him skate out of here to get back to his buddies. It takes one check.

I ask you all to go back in that jury room, look at the evidence, consider the testimony, sit down at that table with the jury verdict, with the jury form, and stop it. You stop it today. You tell [the Defendant] that he's responsible for his actions on the night of May the 5th, and find him guilty of first degree murder.

After eight and one-half hours of deliberations, the jury found the Defendant guilty of premeditated first-degree murder, and the trial court imposed a statutory life sentence.

## ANALYSIS

On appeal, the Defendant raises the following issues: (1) whether the evidence was sufficient to support his conviction; (2) whether the admission of the Defendant's gang membership and the "prior bad acts" of Mr. Jackson violated Tennessee Rules of Evidence 403 and 404(b)[7]; (3) whether the trial court erred by "not allowing" the Defendant to independently test the victim's GSR kit; (4) whether the trial court erred by

---

[7] For efficiency, we have consolidated several of the Defendant's issues into this one overarching complaint.

-29-

"not compelling the State to produce the photograph referred to in the gang report"; and (5) cumulative error. We will address each in turn.

## I. Sufficiency of the Evidence

The Defendant contends that the evidence adduced at trial was insufficient to establish premeditation, identity, or criminal responsibility, arguing that no direct evidence established his presence at the crime scene. The State asserts that the evidence was sufficient, arguing that the bullet caliber and brand in the victim's gun matched the bullet recovered from the Defendant at the hospital, that the .45-caliber Hi-Point pistol recovered from "the [D]efendant's fellow gang member" was the gun that was used to shoot the victim, and that "medical personnel found a live .45-caliber round in the [D]efendant's possession." Relative to premeditation, the State argues that the victim was shot seven times, including one contact wound to the chest, and that "[w]hen the victim attempted to flee to the safety of his home, the assailants shot him six more times[.]"

An appellate court's standard of review when the defendant questions the sufficiency of the evidence on appeal is "whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." Jackson v. Virginia, 443 U.S. 307, 319 (1979). This court does not reweigh the evidence, rather, it presumes that the jury has resolved all conflicts in the testimony and drawn all reasonable inferences from the evidence in favor of the State. See State v. Sheffield, 676 S.W.2d 542, 547 (Tenn. 1984); State v. Cabbage, 571 S.W.2d 832, 835 (Tenn. 1978). Questions regarding witness credibility, conflicts in testimony, and the weight and value to be given to evidence were resolved by the jury. See State v. Bland, 958 S.W.2d 651, 659 (Tenn. 1997).

A guilty verdict "removes the presumption of innocence and replaces it with a presumption of guilt, and [on appeal] the defendant has the burden of illustrating why the evidence is insufficient to support the jury's verdict." Bland, 958 S.W.2d at 659; State v. Tuggle, 639 S.W.2d 913, 914 (Tenn. 1982). A guilty verdict "may not be based solely upon conjecture, guess, speculation, or a mere possibility." State v. Cooper, 736 S.W.2d 125, 129 (Tenn. Crim. App. 1987). However, "[t]here is no requirement that the State's proof be uncontroverted or perfect." State v. Williams, 657 S.W.2d 405, 410 (Tenn. 1983). Put another way, the State is not burdened with "an affirmative duty to rule out every hypothesis except that of guilt beyond a reasonable doubt." Jackson, 443 U.S. at 326.

The foregoing standard "applies to findings of guilt based upon direct evidence, circumstantial evidence, or a combination of [both] direct and circumstantial evidence."

State v. Pendergrass, 13 S.W.3d 389, 392-93 (Tenn. Crim. App. 1999). Both "direct and circumstantial evidence should be treated the same when weighing the sufficiency of such evidence." State v. Dorantes, 331 S.W.3d 370, 381 (Tenn. 2011). The duty of this court "on appeal of a conviction is not to contemplate all plausible inferences in the [d]efendant's favor, but to draw all reasonable inferences from the evidence in favor of the State." State v. Sisk, 343 S.W.3d 60, 67 (Tenn. 2011).

First degree premeditated murder is defined as "[a] premeditated and intentional killing of another." Tenn. Code Ann. § 39-13-202(a)(1). A person acts intentionally "when it is the person's conscious objective or desire to engage in the conduct or cause the result." Tenn. Code Ann. § 39-11-302(a).

> Premeditation is an act done after the exercise of reflection and judgment. Premeditation means that the intent to kill must have been formed prior to the act itself. It is not necessary that the purpose to kill pre-exist in the mind of the accused for any definite period of time.

Tenn. Code Ann. § 39-13-202(d) (internal quotations omitted).

The element of premeditation only requires the defendant to think "about a proposed killing before engaging in the homicidal conduct." State v. Brown, 836 S.W.2d 530, 541 (Tenn. 1992). The presence of premeditation is a question for the jury and may be established by proof of the circumstances surrounding the killing. Bland, 958 S.W.2d at 660. Our supreme court has held that factors determining the existence of premeditation include, but are not limited to, the following: the use of a deadly weapon upon an unarmed victim, the particular cruelty of the killing, declarations by the defendant of an intent to kill, evidence of procurement of a weapon, preparations before the killing for concealment of the crime, destruction or secretion of evidence of the killing, and calmness immediately after the killing. See State v. Davidson, 121 S.W.3d 600, 614 (Tenn. 2003); Bland, 958 S.W.2d at 660. Additional factors cited by this court from which a jury may infer premeditation include the lack of provocation by the victim and the defendant's failure to render aid to the victim. See State v. Lewis, 36 S.W.3d 88, 96 (Tenn. Crim. App. 2000). "Tennessee cases have long recognized that premeditation may be proved by circumstantial evidence" because "premeditation involves the defendant's state of mind, concerning which there is often no direct evidence." Davidson, 121 S.W.3d at 614-15. "Although a jury may not engage in speculation, it may infer premeditation from the manner and circumstances of the killing." State v. Jackson, 173 S.W.3d 401, 408 (Tenn. 2005).

In the light most favorable to the State, the Defendant's identity and the intentional nature of the victim's murder were circumstantially proven. The victim was shot seven times on his front porch; the victim's .40-caliber pistol, which was fired from inside his

jacket pocket, was generally consistent with the .40-caliber bullet recovered from the Defendant in surgery. The bullets from the victim's gun were also the same brand as the bullet recovered from the Defendant. The bullet recovered from the victim at autopsy was .38-caliber, and the shell casings on the porch were .45-caliber, indicating the use of two guns. Although the chain of custody for the .45-caliber unfired bullet in the Defendant's hospital room was incomplete, it was located on a table at the Defendant's bedside next to a bag of his clothing in a room in which the Defendant was the only patient. The victim's neighbor saw a white SUV leaving the scene, and Mr. Collins saw a white Mitsubishi SUV driving recklessly along a route that was consistent with one of the primary routes to Erlanger hospital. Seven to eight minutes after the first 9-1-1 call, the hospital surveillance recording showed the Defendant's being dropped off by Mr. Duncan and another man. The route from the victim's house to the hospital took about ten minutes under normal conditions. Moreover, the light-colored SUV in which the Defendant arrived at the hospital was similar in appearance to the speeding Mitsubishi Endeavor described by Mr. Collins.

Relative to premeditation, however, we conclude that the evidence was insufficient. The fact that the victim suffered multiple wounds is not enough, standing alone, to prove premeditation. Brown, 836 S.W.2d at 543. Notably, the State's appellate brief does not cite any factors other than the victim's injuries to support its argument regarding premeditation.[8] Although the State argued at trial that the Defendant "prepared" to go to the victim's house, there was no evidence presented to suggest that the murder was planned. The Defendant's possibly being armed is not proof that he armed himself in preparation for this confrontation. The victim was also armed and apparently shot the Defendant during the altercation. Although the Defendant failed to render aid to the victim, he was himself wounded and had to be carried into the emergency room by his compatriots; it is unclear whether he was capable of rendering aid or summoning help at the crime scene. We acknowledge that the State is not required to prove motive; however, the circumstantial evidence in this case fell far short of proving premeditation beyond a reasonable doubt.

We note that although the trial court found during the motion for a judgment of acquittal that an attempted robbery had been circumstantially proven as a possible motivation for the murder, the evidence belied this theory. The victim was left with $590 cash, a gun, and a bag of pills; his new car, which contained more drugs, was not disturbed. In addition, even if an attempted robbery had been proven, it would have

---

[8] We note that at oral argument, the State cited the Defendant's failure to aid the wounded victim as a factor supporting premeditation. However, the prosecutor at trial did not argue this factor, citing only that the shooting was "planned," that the victim suffered seven gunshot wounds, and that the victim was attempting to flee. The State may not rely on different arguments on appeal than were presented at trial.

supported a conviction for felony murder, not premeditated murder; however, the Defendant was not indicted for felony murder.

Because the evidence was insufficient relative to premeditation, the Defendant's conviction for premeditated first degree murder must be reversed. However, because the Defendant's involvement in the murder was circumstantially proven and criminal responsibility was charged to the jury,[9] the evidence was sufficient to support a conviction for second degree murder.

Generally, this court would order entry of an amended judgment on the lesser-included offense. In this case, because we conclude that some gang-related evidence was unfairly prejudicial and its admission was not harmless, we remand for a new trial on one count of second degree murder, to be conducted consistently with our instructions as elaborated below.

## II. Gang Evidence

The Defendant contends that the trial court erred by admitting evidence about his gang membership, including the gang validation form and accompanying photographs. In a related issue, he argues that the trial court erred by admitting evidence of Mr. Jackson's[10] unspecified "prior bad acts." In the amended motion for a new trial, the Defendant discussed Mr. Jackson's gang validation form as well as the evidence of the robberies in which Mr. Jackson was allegedly involved. The State responds that the evidence was properly admitted to "show identity and complete the story" and that the trial court's limiting instructions were sufficient to prevent the jury from improperly considering the evidence. At oral argument, the State asserted that the evidence at trial was "pretty limited" in comparison to that presented at the pretrial hearing, consisting only of the gang validation report and photographs of the Defendant's tattoo and two groups of people with the Defendant.

Tennessee Rule of Evidence 401 defines "relevant evidence" as "evidence having any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence." Generally, relevant evidence is admissible, while irrelevant evidence is inadmissible. Tenn. R. Evid. 402. However, relevant evidence may be excluded if its probative value is "substantially outweighed by the danger of unfair prejudice." Tenn. R. Evid. 403. The admissibility of evidence pursuant to these rules "is a matter within the trial court's discretion and will not be reversed on appeal absent an abuse of that

---

[9] We note that although the State did not argue at trial that the Defendant was criminally responsible for the murder, the Defendant did not object to the jury's being instructed on criminal responsibility.

[10] The Defendant does not contest the admissibility of the evidence of Mr. Duncan's gang membership.

discretion." <u>State v. Biggs</u>, 218 S.W.3d 643, 667 (Tenn. Crim. App. 2006) (citing <u>State v. Dubose</u>, 953 S.W.2d 649, 652 (Tenn. 1997)).

*a.  The Defendant's Gang Membership*

The admission of evidence of other bad acts by the Defendant is governed by Tennessee Rule of Evidence 404(b).  Generally speaking, "[e]vidence of a person's character or trait of character is not admissible for the purpose of proving action in conformity therewith on a particular occasion."  Tenn. R. Evid. 404(a).  This court has concluded on numerous occasions that evidence of gang membership is character evidence.  <u>See, e.g.</u>, <u>State v. Lavelle Mangrum</u>, W2013-00853-CCA-R3-CD, 2014 WL 3744600, at *7-8 (Tenn. Crim. App. July 28, 2014) (concluding that pursuant to Rule 404(b), prejudicial nature of gang evidence outweighed probative value); <u>State v. Ronald Eugene Brewer, Jr.</u>, No. E2010-01147-CCA-R3-CD, 2011 WL 2732566, at *17 (Tenn. Crim. App. July 14, 2011) (concluding that gang evidence was properly admitted under Rule 404(b) where gang rivalry was motive for killing).  To admit such evidence, the rule specifies four prerequisites:

> (1) The court upon request must hold a hearing outside the jury's presence;
> (2) The court must determine that a material issue exists other than conduct conforming with a character trait and must upon request state on the record the material issue, the ruling, and the reasons for admitting the evidence;
> (3) The court must find proof of the other crime, wrong, or act to be clear and convincing; and
> (4) The court must exclude the evidence if its probative value is outweighed by the danger of unfair prejudice.

<u>Id.</u>  When, as here, the trial court substantially complies with the procedural requirements of Rule 404(b), this court will overturn the trial court's ruling only when there has been an abuse of discretion.  <u>See</u> <u>State v. Thacker</u>, 164 S.W.3d 208, 240 (Tenn. 2005).

The rationale underlying the general rule is that admission of such evidence carries with it the inherent risk of the jury's convicting the defendant of a crime based upon his bad character or propensity to commit a crime, rather than upon the strength of the evidence.  <u>Thacker</u>, 164 S.W.3d at 239.  Despite Rule 404(b)'s general proscription on propensity evidence, "Tennessee recognizes three instances in which evidence of uncharged crimes may be admissible: (1) to prove identity (including motive and common scheme or plan); (2) to prove intent; and (3) to rebut a claim of mistake or accident if asserted as a defense."  <u>State v. McCary</u>, 922 S.W.2d 511, 514 (Tenn. 1996) (citations omitted).

-34-

When the evidence at issue bears on identity,

> the probative value of the evidence of other crimes depends upon the extent to which it raises an inference that the perpetrator of the prior offenses was the perpetrator of the offense at issue. Bunch v. State, 605 S.W.2d at 230 (quoting United States v. Powell, 587 F.2d 443, 448 (9th Cir. 1978)). An inference of identity arises when the elements of the prior offense and the charged offense are sufficiently distinctive that one can conclude that the person who committed the former also committed the latter. Id. However, it is not required that the other crime be identical in every detail to the offense on trial. Id. at 231. The evidence must support the inference that the defendant, who committed the earlier acts, is the same person who committed the offense on trial. Id.

State v. Electroplating, Inc., 990 S.W.2d 211, 224 (Tenn. Crim. App. 1998).

Evidence of other acts may be admitted to provide the jury with necessary contextual background. State v. Gilliland, 22 S.W.3d 266, 272 (Tenn. 2000); see also NEIL P. COHEN ET AL., TENNESSEE LAW OF EVIDENCE § 4.04[13] (5th ed. 2005) (evidence admissible to tell the "complete story"). When seeking to introduce prior act evidence in order to complete the story, the trial court must make the following findings:

> (1) the absence of the evidence would create a chronological or conceptual void in the state's presentation of its case; (2) the void created would likely result in significant jury confusion as to the material issues or evidence in the case; and (3) the probative value of the evidence is not outweighed by the danger of unfair prejudice.

Id. at 272.[11]

The Defendant complains of the inclusion of his gang validation form and the group photographs in which other individuals made gang hand signs. The Defendant does not contest the inclusion of the photograph of his tattoo. Likewise, the Defendant's brief includes a block quote regarding expert witness testimony and a portion of the testimony recounting Investigator Penney's experience and training, although he does not explicitly raise any issue regarding the propriety of Investigator Penney's testimony or his expert qualifications. The Defendant's motion for a new trial specifically objected to

---

[11] As stated at oral argument, this court has noted with concern an increase in cases in which the State sought to admit, and the trial court allowed, otherwise irrelevant evidence under the auspices of "completing the story." We remind trial courts and prosecutors that contextual evidence of this nature must be approached with caution, lest the exceptions to Rule 404(b) swallow the rule.

the three gang-related photographs exhibited at trial and the "gang report," as well as general "evidence that the Defendant was a gang member."

We conclude, first, that the trial court abused its discretion by finding that the Defendant's gang membership was relevant to prove his identity as the person who killed the victim or who was criminally responsible for the victim's death. Although the Defendant's gang membership was relevant to his identity as a person who was associated with Mr. Jackson and, by extension, the .45-caliber Hi Point pistol, this aspect of identity bears on completing the story. In the context of identity, Rule 404(b) evidence is typically offered to prove the similarity between a prior act and the instant crime. See, e.g., Electroplating, 990 S.W.2d at 224. There was no indication that the killing was a signature crime committed pursuant to a modus operandi. The fact that the Defendant was a gang member was irrelevant to whether he was present at the crime scene, whether he fired one of the shots that killed the victim, or whether he was criminally responsible for a third party who did shoot the victim.

The evidence at the pretrial hearing did not support the trial court's finding that the Defendant's gang membership was relevant to the Defendant's identity. However, the evidence only had to be relevant for one non-propensity purpose, and it is undisputed by the parties that the Defendant's gang membership was relevant to prove a connection between the Defendant, Mr. Duncan, and Mr. Jackson, thereby establishing a possible connection between the Defendant and the .45-caliber Hi-Point pistol.

We note that during the pretrial hearing, the trial court commented at some length that relative to the probative value of the evidence, it was "influenced" by the Defendant's posting on social media a photograph of his tattoo and posing in photographs with people making gang hand signs. The court opined that when a gang member publicized his status in this way, he should not be able to "duck" that status in court. This was an improper consideration when weighing the probative value of the evidence.

Although the abuse of discretion standard gives the trial court wide latitude to admit evidence of prior bad acts, including gang membership, we are troubled by the breadth of the gang evidence presented in this case, as well as the manner in which the evidence was ultimately argued. Contrary to the State's characterization at oral argument, Investigator Penney's testimony at trial was extensive and not "pretty limited" in comparison to his pretrial testimony. We acknowledge that the Defendant's gang rank and the power structure of the gang were not discussed, but the testimony went far beyond the content of the Defendant's gang validation form and identifying him in the photographs.

Investigator Penney offered information about the origins of the Gangster Disciples in Chicago, including rivalries and violence between rival gangs; discussed

leaders of the gang and the "360" branch of the Gangster Disciples, to which it did not appear the Defendant belonged, and which had a philosophy of "shoot and ask questions later"; mentioned that the Defendant's tattoo contained "720," but did not explain the concept further; described the significance of the gang hand symbols others made in the group photographs, specifically the "pitchfork" and the numbers seven and four, much of which originated in prison; detailed the reasons for which the Defendant was validated as a gang member; and named several people unrelated to the Defendant's case who were also gang members. Although this information[12] was reasonably considered by the trial court in the 404(b) pretrial hearing to establish the Defendant's gang membership, we question the relevance of much of this information at trial. As in many cases, the information here could have been better tailored to minimize the danger that the jury would be distracted and confused by extraneous information.

We note that the Defendant did not lodge a specific objection to the breadth of Investigator Penney's testimony at trial[13] or in the motion for a new trial. Similarly, the State does not argue that some pieces of evidence are admissible even if others are not. However, the record is sufficient for us to consider the appropriate scope of the admissible gang evidence in this case.

We conclude that the general fact of the Defendant's gang membership, the gang validation form, and the photographs of the Defendant with other people making gang hand signs, as supported by Investigator Penney's testimony, were properly admitted. The probative value of the Defendant's connection to Mr. Jackson and the .45-caliber Hi Point pistol was heightened by Defendant's possessing a .45-caliber bullet at the hospital, which was of the same type as the shell casings on the victim's front porch and reflected markings to indicate that it had previously been loaded into a firearm; this was circumstantial evidence that the Defendant possessed a .45-caliber firearm on the night in question. We cannot say that the trial court abused its discretion by finding that the probative value of this evidence outweighed the risk of unfair prejudice. See State v. Montez James, No. W2014-01213-CCA-R3-CD, 2012 WL 4340658, at *12 (Tenn. Crim. App. Sept. 24, 2012) (concluding that probative value of brief gang evidence outweighed danger of unfair prejudice when it proved the relationship between the defendant and codefendants; the defendant was the getaway driver after a robbery). The court properly gave multiple limiting instructions to mitigate the prejudicial effect of the gang evidence.

---

[12] Although the information regarding "360" was incomplete at trial, it was apparent that Investigator Penney intended to differentiate it from "720." The "360" branch of the Gangster Disciples was not discussed at the pretrial hearing; rather, at the pretrial hearing, Investigator Penney indicated that the 720 branch was the "growth and development" branch of the Gangster Disciples and that some members of the 720 branch lived by ideals of community betterment and did not commit crimes.

[13] The Defendant's objection during Investigator Penney's trial testimony dealt with the prejudicial nature of the phrase "shoot and ask questions later," not the propriety of the general gang information.

However, we note that prejudicial effect of the extensive background information about the Gangster Disciples and the origins of various gang signs outweighed its nonexistent probative value. This evidence was of questionable relevance, and in light of the circumstantial evidence and lack of evidence regarding the circumstances of the shooting, the risk of unfair prejudice was very high. This testimony should have been excluded.

In addition, the manner in which the gang evidence was argued exacerbated its prejudicial nature. The State did not delve deeply into the Defendant's gang membership in its initial closing argument; however, the prosecutor referred to the Defendant by his gang nickname, "Sleepy." Defense counsel, in response, discussed that the State was attempting to "scare" the jury with talk of gangs. In rebuttal, the prosecutor then used the Defendant's gang membership to urge the jury to make a statement with its verdict that it would not tolerate the Defendant's "violence, his shooting, his gangs." The prosecutor further entreated the jury to "[s]top it now."

Although no objection was raised by the Defendant, the prosecutor's comments in rebuttal were improper. We do not believe that the comments, in and of themselves, constitute improper prosecutorial argument of such a degree as to require plain error relief; nevertheless, we think that the comments reflect a general undermining of the trial court's multiple limiting instructions and an intent to utilize the gang evidence for impermissible purposes. The last argument the jury heard before deliberating embodied the unfair prejudice that Rule 404(b) seeks to prohibit—the implication that the Defendant was a violent individual and that the jury had a responsibility to make a statement with its verdict regarding the community's intolerance for gang activity.

Generally, the jury is presumed to have followed any limiting instructions issued by the trial court. Gilliland, 22 S.W.3d at 273. To overcome this presumption, the defendant must show by clear and convincing evidence that the jury failed to follow the trial court's instructions. State v. Harbison, 539 S.W.3d 149, 163 (Tenn. 2018).

In the instant case, we are presented with a unique situation in which the jury convicted the Defendant of first degree premeditated murder in spite of the notable lack of evidence regarding premeditation. The State consistently argued that the Defendant himself was the shooter, although an instruction was issued regarding criminal responsibility, and asserted that the Defendant "prepared" for the killing when no evidence indicated a plan to shoot the victim. In spite of this dearth of evidence, the jury convicted the Defendant after hearing extensive testimony about his gang membership, as well as improper rebuttal argument by the State. We conclude that the Defendant has proven by clear and convincing evidence that the jury did not follow the trial court's limiting instructions because the jury issued a verdict contrary to the law and evidence.

Likewise, as a result of the jury's verdict, we cannot say that the improper admission of the extraneous background gang evidence was harmless beyond a reasonable doubt.

Because the Defendant has demonstrated that the jury did not follow the trial court's instructions and that he was unfairly prejudiced by some of the gang evidence in this case, we must remand the Defendant's case for a new trial in which the evidence establishing the Defendant's gang membership is limited. As stated above, the new trial will be on the charge of second degree murder. We discuss below the admissibility of evidence establishing Mr. Jackson's gang membership.

### b. Bad Act Evidence — Mr. Jackson

As stated above, relevant evidence is "evidence having any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence." Tenn. R. Evid. 401. The gang membership of Mr. Jackson, as established by Investigator Penney's testimony and the gang validation forms, was relevant to circumstantially prove the connection between the Defendant and the murder weapon. It was also relevant to prevent jury confusion regarding why Mr. Jackson, who was incarcerated during the victim's murder, came to possess the murder weapon. Unlike the testimony regarding the Defendant's gang membership, the testimony relative to Mr. Jackson's gang membership was brief. Relative to completing the story, the probative value of connecting the Defendant and Mr. Jackson through their shared Gangster Disciples membership was fairly high and circumstantially established the Defendant's possessing the .45-caliber Hi Point pistol on the night of the murder; we cannot say that the trial court abused its discretion in finding that the probative value was not <u>substantially</u> outweighed by the danger of unfair prejudice.

However, Officer Early's testimony regarding the two robberies in which, it was implied, Mr. Jackson participated and used the .45-caliber pistol, was not properly admitted. The fact that these robberies occurred, let alone any details surrounding them, was wholly irrelevant to the Defendant's case and should have been excluded. Likewise, the testimony that the gun had been used in two robberies created an implication that the pistol was habitually used by gang members to commit crimes, making the danger of unfair prejudice extremely high. The trial court abused its discretion by allowing this testimony. On retrial, Officer Early should not be permitted to testify regarding other crimes in which the .45-caliber pistol was potentially used. Likewise, although it is not specifically raised as an issue, we note that the repeated mention of the names of several other gang members who were not connected to this case was irrelevant and improperly admitted.

As discussed above, testimony about the history of the Gangster Disciples and the origins of the symbols represented by gang hand signs is of questionable relevance to the Defendant's case as it relates to third parties like Mr. Duncan and Mr. Jackson. The gang validation form and Investigator Penney's testimony regarding his knowledge of Mr. Jackson as a gang member was sufficient to prove his gang membership without delving into more specifics. Lengthy discussion of gang history heightens the risk of distracting the jury and the risk of unfair prejudice. Although we do not wish to cause a conceptual void by concluding all such evidence is per se inadmissible here, we strongly caution the trial court against its inclusion unless strictly necessary, and even then to limit the amount of information presented.

In sum, the admissibility of the gang evidence as it pertains to third parties is as follows: On remand, the gang membership of Mr. Duncan[14] and Mr. Jackson will be admissible as proven by Investigator Penney's testimony and the gang validation forms. The proof should be limited to that necessary to establish the fact of their respective gang membership. Any testimony regarding the history of the Gangster Disciples and the origins of gang hand signs should be excluded. Finally, any evidence of other crimes committed with the .45-caliber pistol shall not be admitted.

### III.    Victim's GSR Kit

The Defendant contends that the trial court erred by "not allowing" the Defendant to conduct independent testing of the victim's GSR kit. The body of the Defendant's argument on this issue consists of the following: The Defendant recounts, without citation to the trial transcript, the testimony regarding the TBI's policy of not testing victim GSR kits. He then argues that "the GSR Kit should have been tested" and characterizes the lack of testing as a Brady issue. The Defendant continues to state the requirements for establishing a Brady violation; he asserts without further elaboration that the GSR kit "would have established" that the victim did not shoot a gun and that because the State "refused to" test the kit, the Defendant should receive a new trial. The State responds that this issue has been waived for failure to adequately brief the issue, prepare an adequate record, and raise the issue pretrial or at the motion for a new trial.

We agree with the State. Although the record reflects that the Defendant filed a general pretrial motion demanding exculpatory evidence, the record does not include any motion requesting independent testing of the victim's GSR kit or alleging that the State had not provided it to the Defendant upon request. Likewise, the record does not contain a ruling from the trial court on any such motion; moreover, no discussions of a motion

---

[14] The Defendant has not raised the admissibility of Mr. Duncan's gang membership, and for the same reasons discussed above relative to Mr. Jackson, we do not discern plain error in its admission.

are present in the pretrial hearing transcripts in the record. It is the duty of the appellant "to prepare a record which conveys a fair, accurate and complete account of what transpired with respect to the issues that form the basis of the appeal." State v. Taylor, 992 S.W.2d 941, 944 (Tenn. 1999). In the absence of an adequate record on appeal, we "must presume that the trial court's rulings were supported by sufficient evidence." State v. Oody, 823 S.W.2d 554, 559 (Tenn. Crim. App. 1991). In this case, the Defendant has not even provided this court a ruling by the trial court that we may examine.

Moreover, a Brady issue was not raised during trial, and it was not included in the motion for a new trial. See Tenn. R. App. P. 3(e) (providing that no issue presented for review "shall be predicated upon error . . . unless the same was specifically stated in a motion for a new trial; otherwise such issues will be treated as waived."); Tenn. R. App. P. 36(a) (stating that "[n]othing in this rule shall be construed as requiring relief to be granted to a party responsible for an error or who failed to take whatever action was reasonably available to prevent or nullify the harmful effect of an error"). Finally, the Defendant's briefing of this issue does not include appropriate citations to the record or allege facts other than that the State did not test the kit. See Tenn. R. App. P. 27(a)(7) (providing in relevant part that a brief shall contain "[a]n argument . . . setting forth the contentions of the appellant with respect to the issues presented, and the reasons therefor, including the reasons why the contentions require appellate relief, with citations to the authorities and appropriate references to the record . . . relied on."); Tenn. Ct. Crim. App. R. 10(b) ("Issues which are not supported by argument, citation to authorities, or appropriate references to the record will be treated as waived in this court.").[15] This issue has been waived.

Further, the Defendant is not entitled to plain error relief because the record does not clearly establish what occurred in the trial court, and the Defendant has not established that a clear and unequivocal rule of law was breached or that his substantial rights were affected. We note that the State is not required to scientifically test any piece of evidence; however, the failure to test material evidence may be brought out during cross-examination. See State v. Greg Lamont Turner, No. 01C01-9503-CR-00078, 1995 WL 504801, at *3 (Tenn. Crim. App. Aug. 25, 1995); State v. Donald Terry Moore, No.

---

[15] Appellate counsel was found in willful contempt of this court for unacceptable delay in filing his brief and for failing to comply with this court's order to provide documentation within thirty days that he had consulted with a practice coach after he filed a grossly inadequate brief. In spite of all this, counsel's brief is woefully lacking, both in content and in form. Some sections of the brief lack citations to legal authorities, the trial transcript, or both; others state one issue in the section title but raise a different issue in the body of the argument; others do not clearly state a request for relief; typographical and formatting errors abound; and a large portion of the brief appears to have been copied and pasted from online legal research documents. However, the procedural and evidentiary infirmities in this case are sufficiently egregious and clear from the record that we are able to address them, notwithstanding counsel's unwillingness or inability to draft an adequate appellate brief.

01C01-9702-CR-00061, 1998 WL 209046, at *9 (Tenn. Crim. App. Apr. 9, 1998), aff'd, 6 S.W.3d 235 (Tenn. 1999). Moreover, we note Agent Arney's testimony that the victim's jacket pocket contained gunshot residue and damage indicating that the victim fired his gun while it was inside the pocket. Ms. Washington and Ms. Stokes also testified that they moved a gun from beside the victim's body and hid it in the house, and the .40-caliber pistol contained blood spatter from the victim. The victim's having fired a gun was amply proven in this case. The Defendant is not entitled to relief on this basis.

### IV. Photograph of Jeremy Clark

The Defendant argues that the trial court erred by failing to compel the State to produce a photograph referenced in the Defendant's gang validation report. The Defendant also characterizes this issue as the withholding of exculpatory evidence, arguing that the trial court ordered the State to provide the photograph, that the State did not provide it, and that "[e]ither the picture did not exist, or the picture was exculpatory."

The record reflects that before Investigator Penney's trial testimony, the Defendant requested that a line of his gang validation form be redacted. In the section of the report identifying the items for which the Defendant was assigned points, a notation indicated that the Defendant appeared in a photograph with Jeremy Clark and Christian Woods, who were both Gangster Disciples. The State did not seek to introduce the referenced photograph into evidence, and defense counsel objected to the inclusion of additional named gang members who would not appear in the exhibited photographs. The trial court found that the notation was admissible and that "it matter[ed] not that Jeremy Clark [was] not in a photograph that the State" sought to introduce.

Upon questioning by the court, counsel stated that he had not had the opportunity to view the photograph with Mr. Clark. The court ordered the State to show counsel the photograph, but it noted that it would not delay the trial and that counsel had one week between pretrial hearings and the trial in which to obtain the photograph. The prosecutor conveyed that Investigator Penney had the photograph in his file; the court instructed the prosecutor to have Investigator Penney look for the photograph, and the court told counsel that he could question Investigator Penney regarding the photograph on cross-examination. The court noted that if counsel had not seen the photograph before cross-examination, a recess would be held to give counsel time to review it.

The record does not reflect that a recess was held before cross-examination, and counsel did not ask Investigator Penney about the photograph or inform the trial court that he had not received the photograph. In the absence of a contemporaneous objection, the Defendant has waived this issue. See Tenn. R. App. P. 36(a).

-42-

In any event, the Defendant has not demonstrated that a <u>Brady</u> violation occurred; the photograph at issue is not present in the record, and other than the bald assertion that the photograph either "[does] not exist, or . . . [is] exculpatory," the Defendant has not shown how the photograph is material or even favorable to his case. We note that the Defendant's argument in this regard contradicts his complaint that the other photographs of him with Gangster Disciples members were unfairly prejudicial. The Defendant is not entitled to relief on this basis.

*V.      Cumulative Error*

The Defendant contends that the cumulative effect of the alleged errors in this case deprived him of a fair trial. The State responds that no errors occurred. Because we have concluded above that the Defendant is entitled to a new trial based upon the unfairly prejudicial nature of the gang evidence, we need not further address the issue of cumulative error.

CONCLUSION

Because the evidence was insufficient to support the Defendant's conviction for first degree premeditated murder, the judgment of the trial court is reversed. Moreover, because the evidence of the Defendant's gang membership was unfairly prejudicial, we remand his case for a new trial on the charge of second degree murder. The trial court is instructed to bar admission of evidence of the history of the Gangster Disciples and the origins of gang hand signs, as well as any evidence of other crimes committed with the .45-caliber pistol.


_____
D. KELLY THOMAS, JR., JUDGE